# E X H I B I T   1

**EXHIBIT 1**

| SUMMONS | |
|---|---|
| **Second Judicial District Court**<br>Bernalillo County, New Mexico<br>400 Lomas NW<br>Albuquerque, NM 87102<br>**Court Telephone:** (505) 841 - 7438 | Case Number: D-202-CV-2020-00272<br><br>Judge:<br>Lopez, Victor S. |
| Plaintiff: Marjorie Childress<br>v.<br>Defendants: Desilva Automotive Services LLC, Palmer Administrative Services Inc., Vajira Samararatne and Paylink Payment Plans LLC | Defendant name: PALMER ADMINISTRATIVE SERVICES INC.<br><br>Address: c/o your registered agent - Resident Agents Inc. at 8 The Green ste. R, Dover, DE 19901 |

**TO THE ABOVE NAMED DEFENDANT**: Take notice that:

**1.** A lawsuit has been filed against you. A copy of the lawsuit is attached. The Court issued this Summons.

**2.** You must respond to this lawsuit in writing. You must file your written response with the Court no later than thirty (30) days from the date you are served with this Summons. (The date you are considered served with the Summons is determined by Rule 1-004 NMRA). The Court's address is listed above.

**3.** You must file (in person or by mail) your written response with the Court. When you file your response, you must give or mail a copy to the person who signed the lawsuit.

**4.** If you do not respond in writing, the Court may enter judgment against you as requested in the lawsuit.

**5**. You are entitled to a jury trial in most types of lawsuits. To ask for a jury trial, you must request one in writing and pay a jury fee.

**6.** If you need an interpreter, you must ask for one in writing.

**7.** You may wish to consult a lawyer. You may contact the State Bar of New Mexico for help finding a lawyer at www.nmbar.org; 1-800-876-6657; or 1-505-797-6066.

Dated at Albuquerque, New Mexico, this 1/14/2020 day of January, 2020

JAMES A. NOEL
CLERK OF THE DISTRICT COURT

By _____
Deputy Clerk

/s/ Sid Childress

_____
Sid Childress, Lawyer
1925 Aspen Dr. #600A
Santa Fe, NM 87505
505-433-9823
Attorney for Plaintiffs

THIS SUMMONS IS ISSUED PURSUANT TO RULE 1-004 OF THE NEW MEXICO RULES OF CIVIL PROCEDURE FOR DISTRICT COURTS.

**FILED**
**2nd JUDICIAL DISTRICT COURT**
**Bernalillo County**
**1/14/2020 9:34 AM**
**James A. Noel**
**CLERK OF THE COURT**
**Blair Sandoval**

STATE OF NEW MEXICO
BERNALILLO COUNTY
SECOND JUDICIAL DISTRICT COURT

MARJORIE CHILDRESS,

        Plaintiff,

v.                                        case no.        D-202-CV-2020-00272

DESILVA AUTOMOTIVE SERVICES LLC,
PALMER ADMINISTRATIVE SERVICES INC.,
VAJIRA SAMARARATNE and
PAYLINK PAYMENT PLANS LLC,

        Defendants.

## COMPLAINT FOR VIOLATIONS OF THE TELEPHONE CONSUMER PROTECTION ACT, THE UNFAIR PRACTICES ACT AND TORTS

TO THE HONORABLE COURT:

### Introduction

1.      Plaintiff Marjorie Childress ("Plaintiff") is a real person who may be contacted through her undersigned attorney.

2.      Plaintiff brings this action in accordance with New Mexico state-law and the anti-harrassment provisions of the Telephone Consumer Protection Act ("the TCPA"), a federal statute enacted in 1991 in response to widespread outrage about the proliferation of intrusive, nuisance telemarketing. *See Mims v. Arrow Fin. Servs., LLC,* 132 S. Ct. 740, 745 (2012).

3.      The TCPA is intended to protect consumer privacy by prohibiting certain unsolicited, autodialed and pre-recorded message telemarketing calls, and to provide for transparency by

1

requiring that telemarketers identify themselves and who they are calling for during the calls. The New Mexico Unfair Practices Act ("the UPA") is of similar design as it pertains to telephoning consumers.

4.      The TCPA established the National Do-Not-Call Registry ("the Registry"). The Registry allows people to list their telephone numbers and thereby indicate their instructions to NOT receive telephone solicitations. *See* 47 C.F.R. § 64.1200(c)(2).

5.      Telemarketers are required by law to subscribe to and comply with the Registry. 47 U.S.C. § 227(C)(3)(F-G); 16 C.F.R. Part 310 (the FTC's Telemarketing Sales Rule - "**the TSR**"); 47 C.F.R. § 64.1200(c).

6.      Congress made a finding when it enacted the TCPA that "more than 300,000 solicitors call more than 18,000,000 Americans every day". *Federal Communications Commission ("FCC") Report and Order 03-153, July 3, 2003,* ¶¶ 8 & 66 (hereinafter "FCC 03"). As of FCC 03 "the number of **daily calls** [had] increased five fold (to an estimated **104 million**) due in part to the use of new technologies such as predictive dialers." *Id.*

7.      "[U]nwanted robocalls and texts, both telemarketing and informational, top the list of consumer complaints received by" the FCC. *See Omnibus TCPA Order*, GC Docket 02-278, FCC 15-72, 2015 WL 4387780 ¶1 (July 10, 2015).1   Nearly 50% of all calls to cell phones are now robocalls.2

---

1.   The FCC has defined "robocalls" as "calls that require consumer consent", including "calls made either with an automatic telephone dialing system ("autodialer") or with a prerecorded or artificial voice". *Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991,* CG Docket No. 02-278, Declaratory Ruling and Order released on 7/10/15, 30 FCC Rcd. 7961 ("FCC 15-72"), footnote 1.

2.   Senate Committee (US) on Commerce, Science and Transportation, Report 116-41 issued on 5/21/19 for the Telephone Robocall Abuse Criminal Enforcement and Deterrence Act, page 2 with citations.

8.      The Omnibus TCPA Order of July 10, 2015 provides more detail at its paragraph 5:

> "Between 2010 and 2012, consumer complaints about calls to wireless phones doubled, to an average of over 10,000 complaints per month in 2012. In 2013 and 2014, the Commission received roughly 5,000 or 6,000 such complaints per month, lower than in 2011 and 2012, but still a substantial monthly total that is persistently one of the top consumer concerns. The Federal Trade Commission (FTC) reports that it received "approximately 63,000 complaints about illegal robocalls each month" during the fourth quarter of 2009, but that "[b]y the fourth quarter of 2012, robocall complaints had peaked at more than 200,000 per month."

and at its paragraph 7:

> "39 percent of adults were wireless-only in the second half of 2013, compared to fewer than three percent of adults at the beginning of 2003."

9.      The TCPA established a private right of action to receive $500 for each violation of the statute's Subsection B or its implementing regulations. These statutory damages may be trebled by the Court for willful or knowing violations. 47 U.S.C. § 227(b)(3). The TCPA provides a separate cause of action for each call in violation of Subsection C or its implementing regulations. The Court may award statutory damages under Subsection C of up to $1500 for each violative call. 47 U.S.C. § 227(c)(5).

## Jurisdiction and Venue

10.     Plaintiff and her telephone were in the State of New Mexico at the time of the illegal telemarketing the subject of this Complaint that Defendants and/or their agents harassed her with. Plaintiff resides in Bernalillo County. Thus venue is proper.

11.     Defendants do business within New Mexico because Defendants or their agents regularly, automatically, repeatedly telephone the phones of New Mexicans located within New Mexico for the purpose of advertising products and services. Defendants authorized and approved telemarketing to sell products and services throughout the State of New Mexico. By directing

3

telemarketing phone calls into the forum state, Defendants made themselves subject to the  specific personal jurisdiction of the courts of the forum state.

12.     The TCPA was intended to give consumers re-dress even in their local small claims courts where they reside.   See again for example *Mims v. Arrow Fin. Servs., LLC*, supra, 132 S.Ct. at 745-751.   This Court has subject matter jurisdiction.

### the Defendants and their AutoDialing conspiracy

13.     Defendant  VAJIRA SAMARARATNE ("Ratne" or "Defendants") is a California resident who should be served the Court's Summons in this matter at   7718 Independence Ave, Canoga Park, CA  or wherever he may be located.

14.     Desilva Automotive Services, LLC   ("Desilva" or "Defendants") is a California limited liability company with its principal operations and place of business in Canoga Park, CA.  Desilva may be served process by service on its manager  RATNE.

15.     Palmer Administrative Services Inc. ("Palmer" or "Defendants")  is a Delaware limited liability company with its principal operations and place of business in New Jersey.  Palmer may be served a Summons by service on its Delaware registered agent:  Resident Agents Inc. at 8 The Green ste. R, Dover, DE 19901.

16.     Paylink Payment Plans LLC ("Paylink" or "Defendants") is a Delaware limited liability company with its principal operations and place of business in Illinois.  Paylink may be served a Summons by service on its Delaware registered agent:  The Corporation Trust Company at 1209 Orange St., Wilmington, DE 19801.

17.     Desilva does business and operates under its assumed or trade name "ALLIED VEHICLE PROTECTION".  Desilva's business is to manage, direct, control and operate call-centers that

market vehicle service contracts ("VSCs") by outbound telemarketing. Desilva's most recent Statement of Information Ratne filed for it with the California Secretary of State is attached hereto as **Exhibit 1** in support of this Complaint.3

18.     Ratne is Desilva's principal real person member and manager and he dominates and controls Desilva. Ratne sets and establishes all Desilva's policies, practices and operations. Ratne controlled and directed Desilva's actions and inactions the subject of this Complaint.

19.     Desilva, at the direction and under the control of Ratne, is either directly operating its own call-center or has contracted with a marketing company to engage in call-center, autodialer telephone solicitations intended to sell Palmer's and Paylink's products and services.

20.     Ratne approves and controls the contracts, agreements and operations for autodialing on Defendants' behalf and approves and authorizes payment to the persons who do the actual robocalling.

21.     Ratne designed, controls and approved the standardized telemarketing messages and sales pitches directed at consumers in the robocalling including the robocalling that harrassed Plaintiff as described below.

22.     Ratne and Desilva have initiated or directed hundreds of thousands or millions of unlawful robocalls into the State of New Mexico, directed at New Mexico consumers, using telemarketing sales scripts that only identify the caller as "*National Dealer Services*" or "*Dealer Services*". Ratne and Desilva do not subscribe to the Registry and do not scrub their calling lists against the Registry's lists of 505 or 575 area code phone numbers.

23.     Ratne using Desilva to do so markets and sells vehicle service contracts provided, produced

---

3.     Noting under TYPE OF BUSINESS: "Call Center for auto warranties"

and administered by Palmer.

24.     Paylink by agreement with Palmer and Desilva finances the purchase price of Palmer's VSC's sold to consumers by Desilva's telemarketing.

25.     Desilva receives a fee or commission from Palmer and/or Paylink for each of Palmer's VSC's Desilva sells and Paylink finances.

26.     Paylink allows Desilva access to Paylink's information and operating systems so Desilva can sell VSC's with robocalling and financing.  Desilva would not be able to sell any significant amounts of VSC's without Paylink's financing and services.

27.     Paylink allows Desilva to enter consumer information into Paylink's operational systems so Paylink can profit from the robocalling and financing.

28.     Paylink allows Ratne and Desilva to use its service marks in VSC transactions with consumers on behalf of Palmer, including the transaction with Plaintiff described in more detail below, and as shown by the attached 2-page **Exhibit 2** in support of this Complaint ("Paylink Payment Plan Agreement").

29.     Paylink approves and provides the financing forms and agreements to be used with consumers in Desilva's robocall transactions.

30.     Paylink delegates to Ratne, Desilva and Palmer the ability to make a contract between robocalled consumers including Plaintiff using parameters set by Paylink, including Paylink's absolute control over whether and under what circumstances it would accept Plaintiff or any other robocalled consumer as a customer.

31.     Paylink has received, reviewed and continues to regularly receive and review numerous similar complaints from robocalled consumers about the products and services Paylink and Palmer

6

provide.  Many of these complaints have informed Paylink that the products and services were sold by robocalls.  For example Paylink recently received and responded to a complaint the Better Business Bureau forwarded to it that stated in pertinent part:

> "On several occasions PayLink Direct has been part of a scheme to extort monies from my elderly mother. First, in March 2019, PayLink along with its client, ******** **** ***, pressured my mother into a auto service contract that was both unnecessary and unneeded. Pursuant to a letter dated April 25, 2019, the contract was cancelled, however, these companies illegitimately retained monies that were paid through a credit card. I demand that these monies (over $131.32) be refunded immediately.  In the second case, Paylink along with ****** Administration pressured my mother into an unnecessary service contract through **unsolicited phone calls aimed at elderly persons**.  They have charged my mother $148.75/mo. Letter dated October 28, 2019 has been sent to terminate this contract. I demand that this contract be cancelled, any outstanding balance be extinguished and any monies received be properly refunded.  In addition, PayLink needs to place my mother's name on its list of consumers whom it will not accept accounts."

32.     Paylink knows that many of the VSCs it chooses to finance are sold via unsolicited phone calls including robocalls, and that the sellers would not be able to sell the VSCs or even profitably engage in robocalling without the substantial assistance and support of Paylink's services and participation in the transactions with consumers who respond positively.

33.     Paylink chooses to not exercise supervision over the marketers it allows to use its services and service marks.     Instead, Paylink chooses to remain willfully or consciously ignorant of whether or not the marketers to whom it assists with access to its information and operating systems, are complying with the Registry.

34.     Paylink facilitates, condones and relies on the robocalling because it is personally enriched by and profits from the same.

35.     Paylink controlled, controls, directs and directed Ratne and Desilva in the following manner without bothering to confirm whether Ratne and/or Desilva comply with the TCPA, the

7

TSR and applicable state-laws:  Paylink gave them access to Paylink's information and operating systems so Desilva can sell VSCs with robocalling and financing;  Paylink allows them to enter consumer information into Paylink's operational systems;  Paylink allows them to use Paylink's service marks in VSC transactions with consumers on behalf of Palmer;  Paylink approves and provides the financing forms and agreements to be used with robocalled consumers;  Paylink delegates to Ratne, Desilva and Palmer the ability to make a contract between robocalled consumers and Paylink using parameters set by Paylink, including Paylink's absolute control over whether and under what circumstances it would accept any robocalled consumer as a customer.

36.      Palmer does not engage in direct marketing of the VSCs it produces and administers. Palmer arranges for and relies on third-party sellers such as Ratne and Desilva to directly market its products and services.

37.      In fact, in some jurisdictions Palmer is prohibited by law from engaging in direct marketing and is required to rely solely on third-party sellers such as Ratne and Desilva.   For example California Insurance Code § 12810 expressly provides that "No person, other than a seller, shall sell or offer for sale a vehicle service contract to a purchaser", and "No obligor shall use a seller as a fronting company and no seller shall act as a fronting company."[4]

38.      Palmer has a legal duty, is expected and is required to exercise control and supervision over its sellers to see that the sellers comply with the TCPA, the TSR and applicable state-laws.

39.      Palmer has received, reviewed and continues to regularly receive and review numerous

_____

4.      The statutes define "seller" to exclude VSC producers, administrators or obligors such as Palmer.

8

similar complaints from robocalled consumers about the products and services Palmer provide. Many of these complaints have informed Palmer that the products and services were sold by robocalls.

40.     Palmer is also made aware that Ratne and Desilva use robocalling to sell its products and services when consumers make claims to Palmer.  Some of these consumers describe how they acquired Palmer's products and services including the marketing methods that brought Palmer's products and services to their attention.

41.     Palmer's standard form of VSC it authorized Ratne and Desilva to sell for it expressly, conspicuously states on almost every page "NO CLAIMS WILL BE PAID WITHOUT PRIOR AUTHORIZATION", and the contract-holders are directed to call Palmer directly for this prior authorization.

42.     Palmer controlled, controls, directs and directed Ratne and Desilva in the following manner without bothering to confirm whether Ratne and/or Desilva complied with the TCPA, the TSR and applicable state-laws:  Palmer gave them access to its information and operating systems so Desilva can sell Palmer's VSC's with robocalling;  Palmer allows them to enter consumer information into Palmer's operational systems;  Palmer allows them to use Palmer's name in VSC transactions with consumers on behalf of Palmer;  Palmer approves and provides the contract forms and agreements to be used with robocalled consumers;  Palmer delegates to Ratne and Desilva the ability to make a contract between robocalled consumers and Palmer using parameters set by Palmer, including Palmer's absolute control over whether and under what circumstances it would accept any robocalled consumer as a customer.

43.     While it exercises control over Ratne and Desilva, Palmer knows or chooses to be

9

consciously indifferent to the fact that the VSCs Desilva sells for it are sold via unsolicited phone calls including robocalls, that neither Ratne nor Desilva subscribe to or comply with the Registry, and that Desilva would not be able to sell the VSCs or even profitably engage in robocalling without the substantial assistance and support Palmer provides Desilva.

44.     Palmer chooses to tolerate, condone and rely on Desilva's robocalling because it is personally enriched by and profits from the same.

45.     Minimal oversight by Palmer would confirm for Palmer that Desilva manages and operates call-centers without complying with the Registry, the TCPA or the TSR.

46.     Defendants gave and continue to give substantial assistance or support to each other while knowing, consciously avoiding knowing or being recklessly indifferent to the fact that they are all engaged in acts or practices that violate the TCPA, the TSR and applicable state telemarketing laws.

47.     Defendants intentionally use robocalling because it allows for thousands of automated sales calls to be initiated in a very short period of time, but their sales representatives or telemarketers only need actually spend time on the phone with consumers who respond positively.  Defendants thereby illegally shift the cost of aggravation and wasted time to the public at large and away from themselves where it belongs.

### The Illegal Phone Calls to Plaintiff  Defendants are Responsible For

48.     Plaintiff's telephone is a wireless or cell phone assigned the number **505-410-8487**.

49.     Desilva at the direction and under the control of Ratne, or their agents, have repeatedly called Plaintiff's wireless phone with an automatic telephone dialing system ("auto-dialer").

50.     Plaintiff states all Defendants' calls to Plaintiff referred to above were made or initiated

10

with an autodialer because whenever she answered one of these calls she was greeted by an artificial voice or pre-recorded message that told her her auto warranty was about to expire and she should press "1" to speak to a live telemarketer about it.   All these pre-recorded messages were the same.

51.     The use of artificial or pre-recorded voices to greet consumers who answer phone calls, is a tell-tale indicator of mass-marketing by automation as opposed to manual or human-made calls. If a real person were manually dialing phone numbers, this actual human being would not just play a recording to consumers who answer the calls. A sales-person manually making calls would greet answering consumers themselves with their real voice.

52.     The pre-recorded message that greeted Plaintiff when she answered Defendants' calls never gave Plaintiff any accurate identification or location information for any of the Defendants.

53.     If Defendants' live telemarketers came on the line and Plaintiff actually spoke to them, or if they spoke to Plaintiff, the live telemarketers never identified the sponsor of the calls within fifteen (15) seconds of when Plaintiff answered the call or at any other time.   Instead they intentionally gave Plaintiff only fake names that could never be used to accurately identify or locate Defendants:  "National Dealer Services" or "Dealer Services".

54.     After months of repeated robocall harassment by Defendants, and on December 16, 2019 after Desilva caused yet another robocall to be directed at Plaintiff, Plaintiff pressed "1", spoke to a live telemarketer and, so she could actually identify Defendants, bought the VSC Defendants had been peddling.

55.     Desilva took and made a charge on Plaintiff's credit card and soon thereafter Plaintiff received by regular USPS mail a VSC booklet that again identified Desilva and its co-conspirators

Paylink and Palmer.  **Exhibit 2** hereto is a portion of the booklet as is the attached 2-page **Exhibit 3** in support of this Complaint.

56.     Plaintiff's cell phone number referred to above that Defendants or their co-conspirators repeatedly robocalled, has at all relevant times been continuously listed on the National Do-Not-Call Registry ("the Registry").

57.     Defendants do not subscribe to or comply with the Registry as required by law and could not care less that any particular phone number may be listed on the Registry.

58.     Plaintiff never consented to being autodialed or robocalled by Defendants or their agents.

59.     Plaintiff has never had any prior relationship with Defendants.

60.     Defendants' calls complained of herein aggravated and harrassed Plaintiff, wasted her time, invaded her privacy, disrupted her days, were an obnoxious nuisance, cost her money to identify Defendants and cost her electricity to re-charge her phone.

61.     Defendants had the authority and responsibility to prevent or correct the unlawful telemarketing practices that are the subject of this Complaint.

62.     Defendants formulated, directed, controlled and participated in the unlawful telemarketing practices that are the subject of this Complaint.

63.     Defendants' conduct set forth herein and directed at Plaintiff in New Mexico was knowing and willful.

64.     Defendants' conduct set forth herein and directed at Plaintiff in New Mexico was intentional, conscious, deliberate and volitional.

65.     All the calls to Plaintiff the subject of this Complaint occurred within a single 12-month time period.

## Defendants' Direct or Vicarious Liability

66.    For 25 years now the FCC has made clear that "the party on whose behalf a solicitation is made bears ultimate responsibility for any violations." *In the Matter of Rules and Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 10 F.C.C. Rcd. 12391, 12397 ¶ 13 (1995).

67.    In 2013 the FCC explained again in detail that a defendant "may be held vicariously liable under federal common law principles of agency for violations of either section 227(b) or section 227(c) that are committed by third-party telemarketers." *In the Matter of the Joint Petition Filed by Dish Network, LLC*, 28 F.C.C. Rcd. 6574 (2013).   Both actual and apparent authority, and ratification, can be a basis for a finding of vicarious liability. *Id.* at 6586 ¶ 34.

68.    The FCC has instructed that defendants may not avoid liability by outsourcing telemarketing:

> [A]llowing the seller to avoid potential liability by outsourcing its telemarketing activities to unsupervised third parties would leave consumers in many cases without an effective remedy for telemarketing intrusions. This would particularly be so if the telemarketers were ***judgment proof, unidentifiable, or located outside the United States, as is often the case***. Even where third-party telemarketers are identifiable, solvent, and amenable to judgment limiting liability to the telemarketer that physically places the call would make enforcement in many cases substantially more expensive and less efficient, since consumers (or law enforcement agencies) would be required to sue each marketer separately in order to obtain effective relief. As the FTC noted, because "[s]ellers may have thousands of 'independent' marketers, suing one or a few of them is unlikely to make a substantive difference for consumer privacy."

May 2013 FCC Ruling, 28 FCC Rcd at 6588 (¶ 37) (internal citations omitted).

69.    The FCC has rejected a narrow view of TCPA liability, including the assertion that liability requires a finding of formal agency and immediate direction and control over the third-party who placed the telemarketing call. *Id.* at 6587 n. 107.

13

70.     A direct connection exists between all Defendants herein and the robo-calls complained of by Plaintiff because the robo-calls were directly made on behalf of Defendants so they could all profit from a common enterprise in which they all substantially participated.   Plaintiff acquired the originals of Exhibits 2 and 3 hereto as a direct result of the unlawful robocalls to her the subject of this Complaint.

71.     "As the FTC has explained in its Compliance Guide, 'taking deliberate steps to ensure one's own ignorance of a seller or telemarketer's Rule violations is an ineffective strategy to avoid liability.'" *FTC v. Chapman*, 714 F.3d 1211, 1216-1219 (10th Cir. 2013).

72.     Desilva is directly liable and responsible for the phone calls at issue because it actually made or initiated the calls to Plaintiff or it substantially participated.

73.     Ratne, Paylink and Palmer are vicariously liable for the calls complained of by Plaintiff herein because they:

   a)     authorized Desilva or its agents to initiate the phone calls;

   b)     directly or indirectly controlled the persons who actually made or initiated the calls;

   c)     allowed the telemarketers access to information and operating systems within Defendants' control for the purpose of selling goods and services, without which the telemarketers would not have been able to sell the goods and services with their auto-dialing;

   d)     allowed the telemarketers to enter consumer information into Defendants' sales or operational systems;

   e)     approved, wrote, reviewed or participated in developing the telemarketing sales scripts;

   f)     Defendants reasonably should have known or consciously avoided knowing that

14

the actual telemarketers were violating the law and Defendants failed to take effective steps within their power to require compliance;  OR

g)    Defendants gave substantial assistance or support to the other Defendants and each other while knowing, consciously avoiding knowing, or being recklessly indifferent to the fact that Desilva or its agents were engaged in acts or practices that violated the TCPA, the UPA and/or TSR.

74.    Desilva or its agents apparently had authority from Palmer and Paylink to engage in the robocalling at issue because after it sold Plaintiff services offered by Palmer Plaintiff received a VSC from Palmer and was informed she had a payment agreement with Paylink.

75.    Palmer and Paylink ratified the robocalls to Plaintiff described above because they accepted and intended the benefits to them of the calls while knowing or consciously avoiding knowing their telemarketer-agents were autodialing cell phones and using artificial or prerecorded voices messages in unsolicited calls to cell phones.

76.    Paylink is additionally vicariously liable for and subject to all Plaintiff's claims against Desilva and Palmer pursuant to the FTC Holder Rule, 16 C.F.R. § 433.2.**5**

77.    Plaintiff required financing for the transaction, which Palmer and Desilva arranged for Paylink to provide.

78.    The VSC Plaintiff bought so she could identify the Defendants, is a consumer credit contract.

79.    Paylink is the holder of the consumer credit contract and is financing the transaction.

---

5.    See generally *Jaramillo v. Gonzales*, 2002-NMCA-072, regarding the FTC holder rule.

FIRST SET OF CLAIMS FOR RELIEF  -  Violations of the TCPA's Subsection B

80.      The foregoing acts and omissions of Defendants or their agents on their behalf constitute multiple violations of 47 U.S.C. § 227(b) and its implementing regulations.

81.      Plaintiff is entitled to and should be awarded against Defendants $500 in damages for each and every violation of the TCPA's Subsection B and its implementing regulations. Because Defendants' conduct set forth above was knowing and/or willful Plaintiff is entitled to and should be awarded treble damages of up to $1,500 for each and every violation.

SECOND SET OF CLAIMS FOR RELIEF  -  Violations of the TCPA's Subsection C

82.      Defendants or Defendants' agents on Defendants' behalf made telephone solicitations to Plaintiff more than once within 12 months despite the fact her phone number Defendants or their agents called has been continuously listed on the Registry at all relevant times.

83.      For each of Defendants' calls to Plaintiff the subject of this Complaint, Plaintiff should recover up to an additional $1500 pursuant to 47 U.S.C. § 227(c).

COMMON-LAW CLAIMS

84.      Plaintiff hereby sues Defendants for trespass to chattels and for their civil conspiracy to direct an illegal telemarketing campaign into the State of New Mexico and to Plaintiff in particular.

85.      As set forth and described above, Defendants' conduct was knowing, willful, wanton, reckless, intentional and/or grossly negligent with conscious or deliberate disregard of Plaintiff's right to not be subjected to Defendants' illegal harassment.

86.      Plaintiff should have and recover judgment against Defendants for all her actual damages or all her statutory damages, and for an amount of nominal plus exemplary damages sufficient to set an example and deter in the future the conduct complained of by Defendants or others.

FOURTH SET OF CLAIMS FOR RELIEF - UPA Violations

87.     Plaintiff hereby brings this action pursuant to the New Mexico Unfair Practices Act ("the UPA") to recover her statutory damages for each violation of the UPA and her attorney fees.  As set forth above Defendants' conduct was knowing and/or willful therefore Plaintiff is entitled to and should be awarded treble her statutory damages.

88.     Each call to Plaintiff from Defendants the subject of this matter was a distinct violation of NMSA §57-12-22(A) and §57-12-22(C)(1).

89.     Each call to Plaintiff from Defendants the subject of this matter that she answered was an additional distinct violation of NMSA §57-12-22(B)(1).

90.     Each call to Plaintiff from Defendants the subject of this matter was an actionable unfair or deceptive trade practice because each call violated § 310.4 of the Telemarketing Sales Rule.

91.     Ratne. Palmer and Paylink additionally distinctly violated the UPA because pursuant to 16 C.F.R. §310.3(b):

> "It is a deceptive telemarketing act or practice and a violation of this Rule for a person to provide substantial assistance or support to any seller or telemarketer when that person knows or consciously avoids knowing that the seller or telemarketer is engaged in any act or practice that violates §§310.3(a), (c) or (d), or §310.4 of this Rule."

17

WHEREFORE, Plaintiff prays for entry of judgment for  -   her statutory, actual, treble and/or nominal damages and  for exemplary damages sufficient in size to set an example and deter in the future the conduct complained of by Defendants or others.   Plaintiff prays for such other relief as the court finds proper.   Plaintiff requests an award of her attorney fees and costs.

RESPECTFULLY SUBMITTED,

By:

Sid Childress, Lawyer
1925 Aspen Dr. #300A
Santa Fe, NM 87505
childresslaw a hotmail.com
(505) 433 - 9823
Attorney for Plaintiff

18



**Secretary of State**
**Statement of Information**
(Limited Liability Company)

**LLC-12**

19-C41352

# FILED

In the office of the Secretary of State
of the State of California

JUN 24, 2019

**IMPORTANT — Read instructions before completing this form.**

**Filing Fee – $20.00**

**Copy Fees** – First page $1.00; each attachment page $0.50;
Certification Fee - $5.00 plus copy fees

This Space For Office Use Only

---

**1. Limited Liability Company Name** (Enter the exact name of the LLC. If you registered in California using an alternate name, see instructions.)

DESILVA AUTOMOTIVE SERVICES, LLC

| 2. 12-Digit Secretary of State File Number | 3. State, Foreign Country or Place of Organization (only if formed outside of California) |
|---|---|
| 201517310248 | CALIFORNIA |

**4. Business Addresses**

| | City (no abbreviations) | State | Zip Code |
|---|---|---|---|
| a. Street Address of Principal Office - Do not list a P.O. Box<br>7657 Winnetka Ave # 444 | Winnetka | CA | 91306-2677 |
| b. Mailing Address of LLC, if different than Item 4a<br>7657 Winnetka Ave # 444 | Winnetka | CA | 91306-2677 |
| c. Street Address of California Office, if Item 4a is not in California - Do not list a P.O. Box<br>7657 Winnetka Ave # 444 | Winnetka | CA | 91306-267 |

**5. Manager(s) or Member(s)** — If no **managers** have been appointed or elected, provide the name and address of each **member**. At least one name **and** address must be listed. If the manager/member is an individual, complete Items 5a and 5c (leave Item 5b blank). If the manager/member is an entity, complete Items 5b and 5c (leave Item 5a blank). Note: The LLC cannot serve as its own manager or member. If the LLC has additional managers/members, enter the name(s) and addresses on Form LLC-12A (see instructions)

| a. First Name, if an individual - Do not complete Item 5b | Middle Name | Last Name | Suffix |
|---|---|---|---|
| Vajira | | Samararatne | |

b. Entity Name - Do not complete Item 5a

| c. Address | City (no abbreviations) | State | Zip Code |
|---|---|---|---|
| 7657 Winnetka Ave # 444 | Winnetka | CA | 91306-2677 |

**6. Service of Process** (Must provide either Individual OR Corporation.)

**INDIVIDUAL** – Complete Items 6a and 6b only. Must include agent's full name and California street address.

| a. California Agent's First Name (if agent is not a corporation) | Middle Name | Last Name | Suffix |
|---|---|---|---|
| Vajira | | Samararatne | |

| b. Street Address (if agent is not a corporation) - Do not enter a P.O. Box | City (no abbreviations) | State | Zip Code |
|---|---|---|---|
| 15545 Devonshire St Suite 208 | Mission Hills | CA | 91345 |

**CORPORATION** – Complete Item 6c only. Only include the name of the registered agent Corporation.

c. California Registered Corporate Agent's Name (if agent is a corporation) – Do not complete Item 6a or 6b

**7. Type of Business**

a. Describe the type of business or services of the Limited Liability Company
Call Center for auto warranties

**8. Chief Executive Officer, if elected or appointed**

| a. First Name | Middle Name | Last Name | Suffix |
|---|---|---|---|
| Vajira | | Samararatne | |

| b. Address | City (no abbreviations) | State | Zip Code |
|---|---|---|---|
| 7657 Winnetka Ave # 444 | Canoga Park | CA | 91304 |

**9. The Information contained herein, including any attachments, is true and correct.**

| 06/24/2019 | Vajira Samararatne | CEO | |
|---|---|---|---|
| Date | Type or Print Name of Person Completing the Form | Title | Signature |

**Return Address (Optional)** (For communication from the Secretary of State related to this document, or if purchasing a copy of the filed document enter the name of a person or company and the mailing address. This information will become public when filed SEE INSTRUCTIONS BEFORE COMPLETING.)

Name:

Company:

Address:

City/State/Zip:

# SPECIAL STATE REQUIREMENTS/DISCLOSURES

1. Terms of **Agreement** Conformed to Statute - Terms of this **Agreement** which are in conflict with the statutes of the state in which this **Agreement** was purchased are hereby amended to conform to the minimum standards of those statutes.

2. THIS SERVICE AGREEMENT IS ONLY SUBJECT TO LIMITED REGULATION BY THE OFFICE OF THE COMMISSIONER OF INSURANCE.

3. The following special state requirements and/or disclosures apply if this **Agreement** was issued in:

## NEW MEXICO

**Cancellation of Vehicle Service Agreement** - This section is amended to include the following:

If **Your Agreement** has been in effect for at least seventy (70) days, **We** may not cancel it prior to the expiration date, or one year after the effective date of the **Agreement**, whichever comes first, unless:

**(a)** You fail to pay an amount when due;

**(b)** You are convicted of a crime that results in an increase in the service required under the **Agreement;**

**(c)** We discover that fraud was committed or there was a material misrepresentation by **You** in obtaining the **Agreement**, or in presenting a claim for payment;

**(d)** We discover an act or omission by **You** or a violation by **You** of any condition of the **Agreement** that occurred after the effective date of the **Agreement** that substantially and materially increased the service required under the **Agreement.**

**CANCELLATION FEE:** This section is deleted and replaced with the following: The seventy-five dollar ($75.00) administrative fee for cancellation does not apply in New Mexico.

**Section VI. GENERAL - D. Refund Calculation** - This section is deleted and replaced with the following:

If no claim has been made under this **Agreement**, **You** may return this **Agreement** within twenty (20) days of the date the **Agree** was mailed to **You**, or within ten (10) days of delivery if the **Agree** delivered to **You** at the time of sale, whichever is less. In suc this **Agreement** will be null and void and **We** will refund **Yo** amount of the purchase price of this **Agreement**. This right to the **Agreement** is not transferable and applies only to th **Agreement** purchaser. If a refund is not paid by **Us** within sixty after **Your** return of the **Agreement** to **Us**, a ten percent (10% will be added for each thirty (30) day period or portion there refund and any accrued penalties remain unpaid.

S1

SNCWNM01

---

PLAINTIFF'S EXHIBIT
2

---

**PayLink®**

Payment Plan Agreement

Service Contract # | PEOWA386742

| Buyer | | Seller | |
|---|---|---|---|
| Name: | Marjorie Childress | Name: | Allied Vehicle Protection |
| Address: | | Address | 7657 Winnetka Ave #444 |
| City, State, Zip: | Albuquerque, NM | City, State, Zip: | Winnetka, CA  91306 |
| Phone: | | Phone: | 8445290659 |
| E-Mail: | | Salesperson: | Jason Garcia |
| | | | Email: |

| Vehicle Information | | | Contract Effective Date:  01/15/2020 | |
|---|---|---|---|---|
| Make: TOYOTA | Model: RAV4 | | Year: 2011 | Odometer: 92,015 |
| VIN: | | | Coverage Term: (in months) 60 | Coverage Mileage: (in Miles) 100,000 |

You, the Buyer, may buy the Vehicle Service Contract for the cash price shown in the Itemization or according to the terms of this Payment Plan Agreement ("Agreement"). By signing this Agreement, you choose to buy the Vehicle Service Contract from the Seller according to this Agreement. The Vehicle Service Contract is issued by Palmer Administration Services

("Administrator"). The Vehicle Service Contract number is provided at the top of this Agreement. You and we agree to be bound by the terms of the Agreement. "We," "us" and "our" refer to the Seller shown above, and, upon assignment of this Agreement, to PayLink Payment Plans, LLC dba PayLink Direct ("PayLink Direct"). The Important Disclosures below are part of this Agreement.

Excepted as checked, you have purchased the Vehicle Service Contract primarily for personal, family or household use.
☐ Agricultural   ☐ Business

| | Itemization of Payment Plan Amount: | |
|---|---|---|
| (a) | CASH PRICE (before taxes) | $ 3845.50 |
| (b) | TAXES on SALE | $ 0.00 |
| (c) | TOTAL CASH PRICE (a + b) | $ 3845.50 |
| (d) | DOWN PAYMENT | $ 389.50 |
| (e) | AMOUNT FINANCED (c - d) | $ 3456.00 |

Payment Processing Center: PayLink Direct  222 S. Riverside Plaza, Suite 950  Chicago, IL 60606
ph. 800.839.7940 | fx.312.261.4888 | www.paylinkdirect.com

"THE TERMS OF THIS AGREEMENT ARE CONTAINED ON MORE THAN ONE PAGE"

Page F1 of F6                                                                PL PPA3 (05-16)

## IMPORTANT DISCLOSURES

| ANNUAL PERCENTAGE RATE The cost of your credit as a yearly rate. | FINANCE CHARGE The dollar amount the credit will cost you. | Amount Financed The amount of credit provided to you or on your behalf. | Total of Payments The amount you will have paid after you have made all payments as scheduled. | Total Sale Price The total cost of your purchase on credit including your down payment of |
|---|---|---|---|---|
| 0.00% | $ 0.00 | $ 3456.00 | $ 3456.00 | $ 3845.50 |
| | | | | $ 389.50 |

### Payment Schedule

| Number of Payments | Amount of Each Payment | When Payments Are Due |
|---|---|---|
| 18 | $ 192.00 | Monthly beginning 01/16 |

Security Interest: You give us a security interest in any refund due upon cancellation of the Vehicle Service Contract.

Late Charge: Except as provided below, if you do not make your full payment within 5 days of its scheduled due date, you will pay a late charge of the lesser of $20 or 5% on the part of the payment that is late. If you live in Arizona, California, Colorado, the District of Columbia, Florida, Georgia, Hawaii, Idaho, Indiana, Iowa, Kansas, New York, Oklahoma, South Carolina, Virginia, West Virginia, Wisconsin or Wyoming, your late charge will be the lesser of $10 or 5% of the part of the payment that is late if you do not make your payment within 10 days of its scheduled due date. If you live in Maine, Massachusetts, or Mississippi, your late charge will be the lesser of $5 or 5% of the part of the payment that is late if you do not make your payment within 15 days of its scheduled due date. If you live in North Carolina, your late charge will be the lesser of $6 or 5% of the part of the payment that is late if you do not make your payment within 10 days of its scheduled due date.

Prepayment: If you pay off your payment plan early, you will not have to pay a penalty.

Please read this Agreement for additional information on security interests, non-payment, default, and our right to require repayment in full before the scheduled maturity date.

PAYMENT OPTIONS: You have paid Seller the Down Payment in the amount set forth above. You will make your remaining payments as scheduled and disclosed in the Important Disclosures to the Seller or upon assignment, PayLink Direct, using the payment option below.

Payment Processing Center: PayLink Direct 222 S. Riverside Plaza, Suite 950 Chicago, IL 60606
ph. 800.839.7940 | fx.312.281.4888 | www.paylinkdirect.com
*THE TERMS OF THIS AGREEMENT ARE CONTAINED ON MORE THAN ONE PAGE*
Page F2 of F6
PL PPA3 (05-16)

---

## AUTHORIZATION FOR CREDIT OR DEBIT CARD PAYMENT

You authorize us to make the applicable number of consecutive monthly charges to your credit/debit card account listed below, in the amount and on the dates specified in the Important Disclosures above (plus late charges and returned payment charges, if any). This authority will remain in effect until the Payment Plan Amount is paid in full, together with applicable charges if any, or until we receive written notification of termination from you in time to allow reasonable opportunity to act on such notification. You agree to notify us in writing of any changes in your account information or termination of this authorization at least 15 days prior to the next payment date. If you change your credit/debit card account, this authorization remains effective for your new account.

Card Number: _____ ************0736        Expiration Date: _____ 04/22

NOTICE TO BUYER: (1) Do not sign this Agreement before you read it or if it contains any blank spaces. (2) You are entitled to an exact copy of this Agreement. (3) You have the right to cancel the Vehicle Service Contract at any time and make no further payments. (4) You have the right to pay in advance the full amount due without penalty. (5) Keep this Agreement to protect your legal rights.

BY SIGNING BELOW OR BY MAKING YOUR FIRST PAYMENT AFTER YOU HAVE RECEIVED A MAILED OR ELECTRONIC COPY OF THIS AGREEMENT, YOU ACKNOWLEDGE RECEIPT OF A COMPLETED COPY OF THIS AGREEMENT. YOU ACKNOWLEDGE THAT YOU HAVE READ THIS AGREEMENT, INCLUDING THE ARBITRATION PROVISION BELOW, AND YOU AGREE TO BE BOUND BY THE TERMS OF THIS AGREEMENT.

| BUYER | SELLER |
|---|---|
| X *PER PHONE* | By: X *VIP SALES REPRESENTATIVE* |
| Signature | Signature |
| | 12/16/2019        12/16/2019 |
| | Date        Date |

In accordance with the terms and conditions of the agreement between Seller and PayLink Direct, Seller hereby assigns its right, title, and interest in this Agreement to PayLink Direct, at 222 S. Riverside Plaza, Suite 950 Chicago, IL 60606

### ADDITIONAL TERMS AND CONDITIONS

PROMISE TO PAY. You agree to pay us the Payment Plan Amount according to the terms of this Agreement.

LATE CHARGE AND RETURNED PAYMENT CHARGES. You agree to pay the late payment charges specified in the Important Disclosures. The applicable late charge is based upon your state of residence at the time you sign or ratify this Agreement. Except as provided below, if any payment you make is returned unpaid for any reason, after we make any demand applicable law requires and wait the time applicable law requires, you agree to pay us a returned payment charge of $25. If you live in Arizona or Massachusetts, you agree to pay a returned payment charge of $10. If you live in California, Idaho, New York or Utah, you agree to pay a returned charge of $15. If you live in Connecticut, Idaho, New York or Utah, you agree to pay a returned

Payment Processing Center: PayLink Direct 222 S. Riverside Plaza, Suite 950 Chicago, IL 60606
ph. 800.839.7940 | fx.312.281.4888 | www.paylinkdirect.com
*THE TERMS OF THIS AGREEMENT ARE CONTAINED ON MORE THAN ONE PAGE*
Page F3 of F6
PL PPA3 (05-16)

**Allied Vehicle Protection**
7657 Winnetka Ave #444
Winnetka, CA 91306
8445290659

Marjorie Childress

Congratulations! Your valuable mechanical breakdown protection is detailed in the enclosed contract booklet. Please look it over and call with any questions you may have. Thank you for your purchase; we look forward to servicing your protection needs. Please call us for a quote on any other vehicle in your household. Vehicles under 150,000 miles may qualify for additional coverages, and multi-vehicle discounts are available.

Be sure to familiarize yourself with the coverage, maintenance requirements, and procedures in the event of a mechanical breakdown. Proper maintenance of your vehicle will contribute to a trouble free driving experience. You should follow your vehicle manufacturer's recommended maintenance for your driving habits.

We encourage you to store your new service agreement in your vehicle. This document contains important numbers needed in the event of a breakdown.

Welcome to our family of vehicle owners that have the peace of mind and financial security of mechanical breakdown protection.

**THANK YOU AGAIN!**

*AVP SALES REPRESENTATIVE*

Protection Specialist

**PLAINTIFF'S EXHIBIT**
3

**IMPORTANT CONTACT NUMBERS:**

Claims: 888-802-8217

WSTD01

---

**VEHICLE SERVICE AGREEMENT**

Service Agreement #
PEOWA386742

Heritage Automotive Protection 

## PURCHASER INFORMATION

| Purchaser Name | |
|---|---|
| Marjorie Childress | |
| Purchaser's Address | |
| . . . | E-Mail Address |

## SELLER INFORMATION

| Seller Name | |
|---|---|
| Allied Vehicle Protection | |
| Seller Address | |
| 7657 Winnetka Ave #444, Winnetka, CA 91306 | |
| Seller Telephone Number | Seller Code |
| 8445290659 | WA |

## LEIN HOLDER INFORMATION

| Lien Holder Name |
|---|
| Paylink Direct INSTALLMENT AGREEMENT |

## VEHICLE INFORMATION

| Year | Make | Model |
|---|---|---|
| 2011 | TOYOTA | RAV4 |

| Vehicle Identification Number | Vehicle Purchase Price | Sale Odometer |
|---|---|---|
| | | 92,015 |

| In Service Date | Vehicle Purchase Date |
|---|---|
| | |

## COVERAGE INFORMATION

| Coverage | | | | Contract Purchase Date |
|---|---|---|---|---|
| RPP Supreme Powertrain Enhanced | | | | 12/16/2019 |

| Contract Purchase Price | | New/Used | Vehicle Class | Plan Code |
|---|---|---|---|---|
| $3845.50 | | U | 1 | RPOPTE |

| Deductible | Surcharges / Options | | | |
|---|---|---|---|---|
| $ 100 | 4WD | | | |

| Term Months | Term Miles | Expiration Date | Expiration Odometer |
|---|---|---|---|
| 60 | 100,000 | 01/14/2025 | 193,015 |

| Waiting Period |
|---|
| 30 Days AND 1,000 Miles |

This service agreement is not connected, either directly or indirectly, with the warranty issued by the manufacturer of this vehicle. This document is an application for the ROYAL Protection Plan of America motor vehicle service agreement and does not constitute an agreement until accepted by the Administrator listed below.

**Palmer Administrative Services, Inc.**
3430 Sunset Avenue, Ocean, NJ 07712
Customer Service: 800-599-9557    Claims: 888-802-8217
New Mexico License #51913

DNCW50

D1

01/18

# VEHICLE SERVICE AGREEMENT

Palmer Administrative Services, Inc.
3430 Sunset Avenue
Ocean, NJ 07712

Congratulations on **Your** purchase. **You** have selected a comprehensive **Vehicle Service Agreement** giving **You** peace of mind and security against mechanical **Failures** cited in the terms herein.

## CUSTOMER SERVICE – 1 (800) 599-9557

## CLAIMS – 888-802-8217

## IMPORTANT INFORMATION YOU NEED TO KNOW

Please look for **Your** "**Service Agreement**" number on the **Declaration Page**. Please refer to this number in any written or verbal communication, such as requesting information or filing a claim.

**TOPIC / SECTION** ............................................................ **PAGE**

Definitions ........................................................................... 2
Terms and Conditions .......................................................... 3
Other Important Service Agreement Provisions .................. 5
What this Service Agreement Covers ................................... 5
Benefits ................................................................................ 7
What You Must Do To Keep This Service Agreement in Effect .... 8
What To Do In The Event Of A Failure ................................ 9
Repair Facility Guidelines for Claim Handling ................... 10
What This Service Agreement Does Not Cover ................... 11
Cancellation of Vehicle Service Agreement ....................... 14
Transfer Rights and Procedure ........................................... 16
Special State Disclosures (if applicable) ............................. S1

---

I have read and understand this **Service Agreement** in its entirety. Without limiting the specific provisions of this **Service Agreement**, I hereby acknowledge the following:

- **Coverage** listed in **Your Agreement** is not subject to any verbal representation made by the seller of this contract.
- This **Service Agreement** is issued exclusively to me with respect to the **Vehicle** identified on the **Declaration Page**.
- In order to keep this **Service Agreement** in effect, I must perform the oil changes at regular intervals as required by the section **WHAT YOU MUST DO TO KEEP YOUR SERVICE AGREEMENT IN EFFECT**.
- All work covered by this **Service Agreement** must be performed by a repair facility authorized by the **Administrator**.

## DEFINITIONS

The following definitions apply to words frequently used in this **Service Agreement and appear in boldface type.**

**Administrator** refers to Palmer Administrative Services, Inc.

**Declaration Page** – refers to the numbered document (**Service Agreement** Number), which should be enclosed and becomes part of this **Service Agreement**. It gives information about **You, Your Vehicle, Coverage** chosen and other significant data.

**Deductible** – refers to the **Deductible** type and amount **You** will need to pay, as shown in the **Declaration Page** for each component covered under this contract.

**Failure** - refers to the **Failure** of a covered part under normal service. A covered part has failed when it can no longer perform the function for which it was designed solely due to its construction, and not due to the action or inaction of any non-covered parts. A **Failure** does not include gradual reduction in operating performance due to normal wear and tear.

**Service Agreement** – refers to this **Vehicle Service Agreement** that **You** purchased from **Us** to protect **Your Vehicle**

**Vehicle** – refers to the **Vehicle** identified on the **Declaration Page**, which cannot be used for rental, emergency or for-hire purposes.

**We, Us, Our** – refers to Palmer Administrative Services, Inc. 3430 Sunset Avenue, Ocean, NJ 07712, who is obligated to perform under this **Service Agreement**, as indicated on the **Declaration Page**.

**You, Your** – refers to the **Service Agreement** holder named on the **Declaration Page** or the person to whom this **Service Agreement** was properly transferred.



U.S. POSTAGE PAID
FCM LG ENV
SANTA FE, NM
87501
JAN 14, 20
AMOUNT
$7.90
R2303S103547-41



19901



1000

**First Mail**

**CERTIFIED MAIL**



7019 2280 0001 9628 7488

from -
PROCESS SERVER

attn: Resident Agents Inc.
8 The Green, Ste. R
Dover, DE 19901